UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

*In re*:

SPARHAWK LLC, *et al.*,[1]                    Case No.:  26-10527-11
                                             Jointly Administered
                    Debtors.

## DECISION ON MOTION BY WOODTRUST BANK
## TO APPOINT A CHAPTER 11 TRUSTEE

Sparhawk LLC, Sparhawk Properties LLC, Sparhawk Trucking, Inc., and Sparhawk Truck and Trailer, Inc. ("Debtors"), each filed voluntary petitions under Chapter 11 of the Bankruptcy Code on March 13, 2026. A motion for joint administration was granted on March 15, 2026. On March 25, WoodTrust Bank (the "Bank") moved for entry of an order abstaining from and dismissing these cases or, in the alternative, for the appointment of a Chapter 11 Trustee. Dkt. No. 41. Debtors object to the request for the appointment of a Chapter 11 Trustee.

The Court has denied the motion to abstain. This leads to the need for a decision on the motion to appoint a Chapter 11 Trustee under 11 U.S.C. § 1104(a).

As explained below, the motion is granted. The Court finds the appointment is in the best interests of creditors, equity security holders, and

---

[1] Jointly administered with Sparhawk Properties LLC (Case No. 26-10528-11), Sparhawk Trucking, Inc. (Case No. 26-10529-11), and Sparhawk Truck and Trailer, Inc. (Case No. 26-10530-11). This caption applies to all four debtors.

other interests of the estate under 11 U.S.C. § 1104(a)(2). The Court hereby orders the appointment of a Chapter 11 Trustee by the United States Trustee ("U.S. Trustee") as soon as possible.

## FACTS

Debtors operate a transportation and logistical business. Mark Sparhawk ("Sparhawk") is the manager of Debtors.

Sparhawk took over the business from his father. Under his control, the business grew to more than 100 trucks. But he remained "in control" of all aspects of the business. He did not have a chief financial officer or person in charge of accounting. He didn't have a person in charge and supervising all business operations such as marketing and billing or coordinating assignment and management of drivers, owner operators, or loads. All decisions needed to be run by him.

Unfortunately, medical issues arose in 2023 that took Sparhawk from management and supervision of the Debtors for substantial portions of 2023. This negatively impacted the business.

In 2022, there was an in-house CPA who worked on accounting and financial reports. In 2023, this transitioned to Kerber Rose, an outside accounting firm. They would periodically consult and review financial statements, true-up the financials, and prepare tax returns. They also prepared various other tax documents and financial statements.

Debtors began experiencing cash flow issues. To address cash flow issues, Sparhawk approached the Bank to discuss the issue. Working capital

2

had been eroding, overdrafts had occurred, and both payroll and insurance payments were coming due. For a brief time, the Bank agreed to interest-only payments.

Kerber Rose stopped working on the financial and accounting reports and the 2024 tax returns in 2025. The work with Kerber Rose stopped while the process of reviewing year-end financials and while the tax returns were being prepared because payment was not being made for their services.

The working capital and cash flow issues did not improve. When the cash flow problems continued, Sparhawk again met with the Bank. In June 2025, he was asked to sign a letter forbearance agreement. He did so, although no copy of such agreement was provided to the Court. This included a request to turn over the titles to all unencumbered trucks.

 The Bank suggested hiring a financial consultant. Sparhawk and a representative of the Bank interviewed three consultants. The Silverman Group ("Silverman") was selected by Sparhawk. Trevek Sengbusch ("Sengbusch"), a partner at Silverman, was Sparhawk's primary point of contact.

Sparhawk and Sengbusch met almost weekly with the Bank. At times, Sengbusch spoke with the Bank without Sparhawk. Consolidated Operating Performance reports were prepared by Silverman for August, September, and October 2025. Dkt. No. 62-3, Ex. 103. These also included Income Statements.

There were gaps and inconsistencies in financial and accounting records. With the assistance of Kerber Rose in the past, these records were periodically reviewed, corrected, and finalized. That assistance stopped earlier in 2025. Part

of the cause of the inconsistencies arose from the use and input of information into portions of the software used by the company. Individuals in the company used the software for very different purposes. For example, an individual may add information about new loads to be hauled and delivery of a load. Another individual may add information on billing. Other individuals may have entered information about maintenance costs, parts, and repairs. These kinds of inconsistencies were previously addressed with the assistance of Kerber Rose.

In November 2025, Silverman tagged 100 trailers for auction. David Christianson testified he was directed by Silverman to prepare the units for auction. Standard practice when sending trucks to auction is to remove the Samsara units. Mr. Christianson complied with this practice.

In addition to the rolling stock that the Bank financed, Debtors also bought equipment financed by BMO Bank, N.A. ("BMO"), Wells Equipment Finance, Inc. ("Wells"), and Daimler Truck Financial Services, LLC ("Daimler"). Payments were not being made to these creditors.

Despite the lockbox agreement, Sparhawk contacted some customers and directed them to send payment to the office and not to the lockbox. He then took three checks to Nicolet National Bank and opened a new bank account. Funds from the account were then used to make payments to BMO, Wells, and Daimler. Afterward he told Sengbusch about that account. Sengbusch advised him to tell the Bank. He did so.

Recommendations were made by Sengbusch to Sparhawk for ways to increase cash flow, stem the erosion of working capital, and address other

4

improvements for the business. It appears that the recommendations were ignored in large measure.

Sparhawk promised that there would be payments to the Bank to reduce debt. One of the sources would be the sale of excess equipment.

Over the course of several months, Sparhawk first "sold" two trucks, then leased or sold an additional 30 plus trucks and at least three trailers. These sales and leases were to Rene Garcia ("Garcia").

Sparhawk testified that the original agreement with Garcia was for the sale of two trucks. Garcia said he was taking them to Texas. Garcia came to Wisconsin to pick up the trucks. He didn't bring the money for the purchase. He promised he would send it or bring it. So Sparhawk let him take the trucks. Over the next few months, instead of a sale, it was suggested that more trucks could be leased for use in oil fields in Texas. Thus, there was a need for trailers.

Sengbusch asked about this deal. He advised Sparhawk there should be written agreements and more information. Sparhawk ignored that advice. The Samsara tracking devices were removed from the trucks and trailers despite the fact that no payments had been made. The result was an inability to timely geographically locate that equipment. Sparhawk either let Garcia bring his own drivers to take the equipment away or, in some instances, had drivers employed by the Debtors help move the equipment.

Ultimately, the Debtors had no information about the location of any of those trucks. They didn't have any written agreements. No action was taken to

gather information to confirm the arrangements were with legitimate companies. There was a check for $500,000 made payable to Sparhawk dated September 6, 2026, from Bolivar Trucking—a company associated with Garcia. Dkt. No. 53-5, Ex. 5. It was supposed to be payment for the trucks. Sparhawk was told not to deposit the check right away. Eventually it was deposited but was returned NSF. Then there was a check from Felipe Aguirre Mata for $10,000,000. Dkt. No. 53-6, Ex. 6. It was dated December 6, 2025, and was to be for the lease or purchase of equipment. This check was never deposited and would not have cleared.

Matters quickly accelerated and deteriorated as shown by the following events:

| Date | Event |
| --- | --- |
| August 10, 2025[2] | Forbearance Agreement<br>• Debtors must hire financial consultant<br>• Debtors must execute new mortgages including on unencumbered property<br>• Various financial reports must be delivered before 9/2/25 with a weekly budget and liquidating excess assets<br>• By 9/25 Debtors must have hired an accounting firm |
| September 25, 2025 | Amendment to Forbearance Agreement[3]<br>• A lockbox was required<br>• A disposition plan required by 10/10 |
| November 14, 2025[4] | Second Amendment<br>• Debtors waive a right to notice of default |

---

[2] Although this agreement bears the date August 10, it was not actually signed until well after that date. Dkt. No. 53-1, Ex. 1.

[3] Dkt. No. 53-2, Ex. 2.

[4] Again, despite the date on the document, it was not signed until November 21, 2025, as suggested on Dkt. No. 53-3, at 15-18 of that document. Dkt. No. 53-3, Ex. 3.

| | |
|---|---|
| | • Debtors were required to execute and deliver an Assignment for the Benefit of Creditors<br>• If there is a default, the Bank would be entitled to cause to be filed an Assignment for the Benefit of Creditors |
| December 9, 2025 | Wood County Circuit Court filings[5]<br>• Assignment for Benefit of Creditors filed<br>• Motion for . . . Order Authorizing Receiver to enter into Financing Agreement |
| December 10, 2025 | Wood County Circuit Court[6]<br>• Order by Judge Brazeau granting motion approving financing agreement, providing for release of Bank, and providing security |
| December 19, 2025 | Notice to creditors of the Wood County Order[7]<br>• Objections were due before 12/30<br>• Copies of the Financing Agreement could be requested from the office of the Receiver |

The Order was signed by Judge Nicholas J. Brazeau, Jr., on December 10, 2025, approving the Financing Agreement. It was filed the next day. Dkt. No. 105-3, Ex. 126, at 3. It ordered:

1. *The terms and conditions of the Financing Agreement* executed by and between the Receiver and the Lender *are hereby authorized, approved and adopted and made the Order of this Court,* including, without limitation, the Receiver's agreement to grant Lender first priority mortgages, security interests and liens in substantially all assets of Sparhawk, including, without limitation, any claims arising under Chapters 128 and 242 of the Wisconsin Statutes.

    . . .

3. This Order shall constitute an adjudication that *the obligations and the first priority properly perfected mortgage, security interest in and lien on the Collateral granted to the Lender, are not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense, challenge, or claim of any kind.* This Order shall be sufficient and conclusive evidence of the validity,

---

[5] Dkt. No. 105-2, Ex. 125; Dkt. No. 105-4, Ex. 127.

[6] Dkt. No. 105-3, Ex. 126 at 3.

[7] *Id.* at 1.

perfection, and priority of the Lender's security interests and liens without the necessity of filing or recording any financing statement, mortgage, notice of lien, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action to validate or perfect the Lender's mortgage, security interest and lien, or to entitle the Lender to the priorities granted herein. Notwithstanding the foregoing, the Lender is authorized to file, as it deems necessary in its sole discretion, such financing statements, mortgages, notices of liens, and other similar documents against the Receiver and Sparhawk to perfect or to otherwise evidence the Lender's security interest and lien, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the date of entry of this Order; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the Lender's security interest and liens. The Lender's security interests and liens shall be valid and enforceable against the successors and assigns of the Receiver, Sparhawk, *and any trustee or other estate representative appointed in any bankruptcy case.*

*Id.* at 5-6 (emphasis supplied).

## **DISCUSSION**

### **A. Appointment of a Chapter 11 Trustee Under 11 U.S.C. § 1104**

Appointment of a Chapter 11 Trustee is an extraordinary remedy. There is a presumption that a debtor is entitled to remain in possession of its assets and continue operating its business.[8]

An appointment of a trustee is the exception, not the rule.[9] Under section 1104(a), a court may appoint a trustee:

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the

---

[8] 7 COLLIER ON BANKRUPTCY ¶ 1104.02 (16th ed.).

[9] *In re Schroeder Bros. Farms of Camp Douglas LLP*, 602 B.R. 695, 702 (Bankr. W.D. Wis. 2019); *see also In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir. 1989).

case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.[10]

Courts are divided on the burden of proof required of the movant. The majority, including those in the Seventh Circuit, have applied the clear and convincing standard.[11] The minority have relied on a preponderance of the evidence standard.[12]

The Court applies the clear and convincing standard. It is more aligned with the presumption that Debtors are entitled to remain in possession of their business.[13]

    1.   Appointment of a Trustee for "Cause" Under Section 1104(a)(1)

Under section 1104(a)(1), a court *shall* appoint a trustee where there is "cause." Cause is not defined under section 1104(a)(1). A court has considerable discretion to determine when evidence constitutes sufficient "cause" under section 1104(a)(1).[14] In doing so, the Court considers a variety of things—some nuanced and some not. This can include:

---

[10] 11 U.S.C. § 1104.

[11] *In re Waterworks, Inc.*, 538 B.R. 445, 464–65 (Bankr. N.D. Ill. 2015); *In re LHC, LLC*, 497 B.R. 281, 291 (Bankr. N.D. Ill. 2013).

[12] *In re Berwick Black Cattle Co.*, 405 B.R. 907, 912 (Bankr. C.D. Ill. 2009), *subsequently dismissed sub nom., In re Ray*, 597 F.3d 871 (7th Cir. 2010).

[13] *In re LHC, LLC*, 497 B.R. 281, 291 (Bankr. N.D. Ill. 2013).

[14] 11 U.S.C. § 1104(a)(1).

- Considerations of whether the court "find[s] something more aggravated than simple mismanagement in order to appoint a trustee."[15] Thus, a court must base its determination on the totality of circumstances.

- If past management is also current management, confidence in whether a "new leaf" has been turned is important.[16]

- A court did not find gross mismanagement where corporate debtor's chief financial officer testified that debtor's business had been able to grow its cash balance during bankruptcy while keeping current on its accounts payable, and where, under the last filed monthly operating report, debtor had an ending cash balance of $1,053,808.64.[17]

The Court's inquiry is not limited to the enumerated statutory list of fraud, dishonesty, or gross mismanagement. Its inquiry extends to "similar cause."[18] Under section 1104(a)(1), some courts have considered the following factors for determining whether to appoint a trustee:

1. Materiality of the misconduct;

2. Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;

3. The existence of pre-petition voidable preferences or fraudulent transfers;

4. Unwillingness or inability of management to pursue estate causes of action;

5. Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;

---

[15] *In re Fuller's Serv. Ctr., Inc.*, 675 B.R. 575, 591 (Bankr. N.D. Ill. 2025) (citing *In re 4 C Sols., Inc.*, 289 B.R. 354, 370 (Bankr. C.D. Ill. 2003)).

[16] *Id.*

[17] *In re Skytec, Inc.,* 610 B.R. 14 (Bankr. D.P.R. 2019).

[18] 11 U.S.C. § 1104.

6.  Self-dealing by management or waste or squandering of corporate assets.[19]

"[A]lthough courts are directed to appoint a trustee once 'cause' has been established, the determination of whether cause has been established is solely within the discretion of the court."[20]

2.  Appointment of a Trustee Under the "Interests" Standard of Section 1104(a)(2)

An alternative basis for appointment of a Chapter 11 Trustee is contained in section 1104(a)(2).

Section 1104(a)(2) provides that an appointment is appropriate "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor."[21]

Section 1104(a)(2) contains a more flexible standard. It allows the appointment of a trustee even when no "cause" exists.[22] Many courts have considered the following in determining whether to appoint a trustee under that subsection:

1.  the trustworthiness of the debtor;

2.  the debtor in possession's past and present performance and prospects for the debtor's rehabilitation;

---

[19] *In re LHC, LLC,* 497 B.R. 281, 292 (Bankr. N.D. Ill. 2013); *In re Intercat, Inc.,* 247 B.R. 911, 921 (Bankr. S.D. Ga. 2000); *In re López-Muñoz,* 553 B.R. 179, 190 (B.A.P. 1st Cir. 2016), *aff'd,* 866 F.3d 487 (1st Cir. 2017)*; In re Sundale, Ltd.,* 400 B.R. 890, 900 (Bankr. S.D. Fla. 2009).

[20] *In re LHC, LLC,* 497 B.R. at 292.

[21] 11 U.S.C. § 1104(a)(2).

[22] *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

3.  the confidence—or lack thereof—of the business community
    and of creditors in present management; and

4.  the benefits derived by the appointment of a trustee,
    balanced against the cost of the appointment.[23]

"Appointment of a trustee under § 1104(a)(2) is within the sound discretion of

the bankruptcy judge."[24]

**B.  Application of the Testimony to the Factors Set Forth by Case Law
Under Section 1104**

1.  Factors for Appointing Trustee Under Section 1104(a)(1)

a.  *Materiality of the misconduct*

The Bank alleges improper conduct it says is material to the functions of

Debtors' operations. The conduct includes payment of his daughter's college

tuition, loaning an employee $15,000, and taking a motorcycle as collateral

without any documentation.

It also argues the asset lists and accounting records were not accurate.

Finally, it points to a series of transactions with Garcia that resulted in more

than 30 trucks and three trailers being moved to Texas either as sales or leases

that were neither documented nor paid for.

The testimony provided explanation for differences in asset lists.

Sparhawk credibly testified that asset lists are periodically updated. Further,

that copies of various lists are maintained and different individuals at Debtors

---

[23] *Ionosphere Clubs, Inc.,* 113 B.R. at 168; *In re Madison Mgmt. Grp., Inc.,* 137 B.R.
275, 282 (Bankr. N.D. Ill. 1992); *In re LHC, LLC,* 497 B.R. at 293; *In re Eletson
Holdings Inc.,* 659 B.R. 426, 453 (Bankr. S.D.N.Y. 2024); *In re Sillerman,* 605 B.R. 631,
652 (Bankr. S.D.N.Y. 2019); *In re Fuller's Serv. Ctr., Inc.,* 675 B.R. 575, 579 (Bankr.
N.D. Ill. 2025).

[24] *In re LHC, LLC,* 497 B.R. at 293.

possess different lists. For example, there may be one list kept for certain purposes by maintenance staff. While perhaps not the best business recordkeeping practice, there were multiple lists kept by different people for different purposes. Sparhawk was not the person asked by Silverman for the lists. He testified convincingly that he would have been the person most likely to provide a current and more complete list. The Bank failed to establish by clear and convincing evidence that this constituted improper conduct.

With regard to the payment of his daughter's tuition, the testimony was that Sparhawk had not taken a salary or draw in some period of time. Again, while not in a budget approved by Silverman and the Bank—and what may be considered as a preference when viewed with clear hindsight—this again does not establish improper conduct under section 1104(a)(1).

The more troubling allegations relate to Debtors' management of the businesses, the transfers and disposition of rolling stock, and actions taken with regard to payment of some secured creditors after the appointment of a state court receiver. The loss of Debtors' trucks in the transactions with Garcia is not incidental. Rather, the trucks constitute a part of Debtors' business, are collateral of a secured creditor, and either through use by the Debtors or sale could have been the source of significant amounts for the Debtors and their creditors.

Letting more than 30 pieces of equipment worth in excess of an estimated $1 million leave the state without permission might be considered an

13

act of desperation to raise money. Sparhawk may have been scammed. That, however, does not mean that it isn't mismanagement. It is.

All of these items predate these cases. No post-petition conduct has been identified as improper. This factor suggests the Court may find cause to appoint a trustee under section 1104(a)(1), but it is not dispositive.

> b. *Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers*

The testimony did not demonstrate a lack of evenhandedness in dealing with insiders or affiliated entities vis-a-vis other creditors or customers. Rather, the testimony suggests the Debtors sought to treat all the creditors holding security interests in the trucks the same. It was Silverman or the Bank and then the receiver who, at least initially, decided not to make payments to those other equipment lenders for trucks being used to haul freight that was generating accounts receivable for the benefit of the Bank.

The only absence of equal treatment could be the granting of mortgages to the Bank and then the receiver seeking an order of the state court to waive all potential claims against the Bank, grant first priority security interests to it, and assign to it interests in all claims Debtors might have against anyone, including possible claims against the Bank. Finally, asking for an order from the state court that purports to determine that whatever might be in a financing agreement between the receiver and the Bank is enforceable and binding on a bankruptcy court or trustee is not equal treatment when it comes to the interests and rights of all creditors and parties in interest.

The evidence does not satisfy this factor.

14

c.  *The existence of pre-petition voidable preferences or fraudulent transfers and unwillingness or inability of management to pursue estate causes of action*

The next two considerations are connected in this case.

Sparhawk made payment to his daughter's college to pay her tuition. While there may be an explanation that is understandable, it may constitute an avoidable transfer or payment.

More significant is Sparhawk's testimony on cross-examination by Attorney Erin A. West. Sparhawk testified he used $200,000 from Sparhawk Trucking, Inc., to fund the purchase of Hollyrock's Bar. Hollyrock's Bar was purchased by an entity called MAS Rocks LLC. Sparhawk confirmed he was the sole owner of MAS Rocks LLC. He also confirmed that he did not repay Sparhawk Trucking, Inc., for the $200,000 used to purchase the bar. This purchase was a transfer to an insider pre-petition. It may consist of a fraudulent transfer. Such a purchase weighs in favor of finding cause to appoint a trustee under section 1104(a)(1).

There are other prepetition transfers that may also be avoidable. Those include the granting of a mortgage to the Bank on three parcels it did not have as security. Dkt. No. 118, Ex. 132, at 4-5. There was a mortgage to another creditor on one but apparently equity in it. The other two parcels were unencumbered. *Id.*

The testimony does not prove that Sparhawk has been unwilling or unable to pursue estate causes of action. Attorney West conducted several

15

lines of questioning during her cross-examination of Sparhawk that implicates this factor.

First, Attorney West asked Sparhawk if he was willing to sue his daughter, Hollyrock's Bar, and MAS Rocks. Attorney Kerkman objected to her question. The Court sustained the objection because it was a legal conclusion. As such, this exchange does not establish an unwillingness or inability to pursue estate claims.

Second, Attorney West questioned Sparhawk regarding his decision not to submit an insurance claim for the missing trucks. Sparhawk testified that it did not make sense to submit a claim considering the value of the trucks. As a member of a cooperative insurance company, Sparhawk noted he would not gain anything considering he would be responsible for a couple hundred thousand dollars. His explanation is reasonable and not indicative of an unwillingness or inability to pursue estate causes of action.

Third, Attorney West asked Sparhawk whether he was willing to report the stolen trucks as a crime.  Sparhawk said he considered it. But he did not report the crime to any law enforcement. He explained that he "got played" and he "let it happen." Dkt. No. 99, at 172.

The timing of that request was after a receiver was appointed. The explanation for the question was that it would be something that could support an insurance claim. The Bank suggests that not filing an insurance claim demonstrates mismanagement or an unwillingness to act.

16

The testimony, however, presented a different and plausible explanation. The insurer is a cooperative made up of 51 trucking companies. For any claim there is a deductible. If there is a loss paid in excess, the members contribute to fund the amount of coverage. But, in the next year, Sparhawk would have received an assessment requiring it to contribute an amount necessary to reimburse the amounts paid by all the other trucking companies. In addition, insurance coverage could have been canceled. So, it seems there may have been a valid business judgment underlying this decision.

While his decision reflects poor judgment and some embarrassment, it does not, without more, prove an unwillingness or inability to pursue estate causes of action.

While suggesting lack of evenhandedness, the evidence does not support this factor by clear and convincing evidence at this time.

> d. *Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor*

Sparhawk's purchase of Hollyrock's Bar with the $200,000 check from Sparhawk Trucking's corporate account presents a conflict of interest. Such conduct supports a finding of cause to appoint a trustee under section 1104(a)(1).

> e. *Self-dealing by management or waste or squandering of corporate assets*

The testimony demonstrates waste or squandering of corporate assets. Sparhawk's testimony on his current business arrangements raises concerns about his judgment.

Sparhawk said he continues to have four trucks in the possession of a company in Texas. He receives no compensation for the company's use of the trucks. Sparhawk did not explain his reasoning for such an arrangement. On its face, the business arrangement does not provide any apparent material benefit to Debtors. Coupled with the continued and indefinite use of estate assets by a third party, there is a suggestion of waste or squandering of corporate assets.

Further, Sparhawk testified about a relationship he has with a man named Adrian Muniz ("Muniz"). He said that Muniz was initially a potential buyer of one of the missing trucks who reached out to him inquiring about the suspiciousness of a sale of a truck. Sparhawk confirmed he agreed that Garcia was selling the trucks without titles. According to Sparhawk, Muniz has helped him look for his missing trucks.

Sparhawk testified that two "show trucks" are in Muniz's family lot. Sparhawk says these two "show trucks" are not being used.

He also says two other trucks are being used by a man named Omar. But he wasn't involved in that arrangement. Rather, Muniz arranged Omar's use of the trucks. Sparhawk notes he does not receive any compensation for this arrangement.

The motives for such business arrangements are unclear. That said, permitting others to use Debtors' trucks without compensation, insurance, written agreements, or a clear end date of the use does not satisfy any sound

18

business judgment or the fiduciary duties of management. Such considerations support a finding of cause under section 1104(a)(1).

2. Factors for Appointing Trustee Under Section 1104(a)(2)

a. *The trustworthiness of the debtor*

Debtors' witnesses appear sincere. Even so, the Debtors redirected cash collateral into a new bank account. This was done with the knowledge it was collateral of the Bank and an agreement that all accounts receivable collections would be deposited in accounts at the Bank.

The Debtors agreed to dispose of excess equipment. Arrangements were made for various equipment to go to auction. Then, without consulting the Bank, Debtors began to dispose of equipment without payment. Permitting more than 30 trucks and three trailers to leave the state without payment and after the Samsara devices were removed evidences gross mismanagement.

Using $200,000 of Debtors' money to buy a bar certainly isn't in the interest of the Debtors or their creditors.

These incidents alone demonstrate the Debtors are not trustworthy in the management of the business or protection of its assets. That said, the testimony highlighted moments of Sparhawk's poor judgment in managing the Debtors. Although these concerns relate to Sparhawk's decision-making, he is the person in control of the Debtors. He is the person who made promises and agreements and then ignored those agreements. He was aware of various requirements and acted to the contrary. Thus, there are genuine doubts about

19

whether the management of Debtors can be trusted to carry out their fiduciary

duties.

       b. *The debtor in possession's past and present performance and prospects for the debtor's rehabilitation*

Debtors are under the management and control of Sparhawk. He testified

he was confident the business would improve. Sparhawk testified the company

is performing the way it should. He said Debtors' rates are considerably higher

because the spot market flipped.

Although, at a glance, the weekly income and expense budgets may seem

to support Sparhawk's testimony on Debtors' improvement, the data does not

support his optimism.

The weekly budgets are missing numerous items for an ongoing

business. Dkt. No. 66-1, Ex. 113; Dkt. No. 90. For example, no amounts for

depreciation or debt service are included. There are no expenses for

professional fees including accountants and lawyers.  The company is

overleveraged. It is unclear whether the Debtors could generate the needed net

amounts required to service all of the loans let alone afford to replace aging

equipment.

Sparhawk deposited customer checks in a Nicolet National Bank account

to pay Sparhawk Trucking's equipment lenders. The checks were collateral of

the Bank.

He engaged in a history of questionable transactions with third parties.

His dealings with Garcia are beyond simply poor judgment and naivete.

Sparhawk gave Garcia two trucks without receiving payment. Later, he sold or

leased numerous additional trucks to Garcia without receiving payment. By those actions, Debtors transferred more than a million dollars of Debtors' equipment to Garcia. Sparhawk demonstrates a cavalier attitude about Debtors' property. These circumstances support appointing a trustee under section 1104(a)(2).

> c. *The confidence—or lack thereof—of the business community and of creditors in present management*

The Bank lacks confidence in Debtors' present management. Other than Sparhawk, there was no evidence presented about anyone with confidence in his management.

Although the Bank appears to be the only creditor to formally raise such concerns, it is Debtors' largest creditor. Based on the testimony, the Court concludes Sparhawk may be an optimistic person with hopes for the Debtors. Those wishes, however, are not reliable or achievable by present management. This factor supports appointment of a trustee.

> d. *The benefits derived by the appointment of a trustee, balanced against the cost of the appointment*

Appointment of a trustee would provide independent oversight, enhance transparency with the Court and Debtors' creditors, and potentially restore the Bank's confidence in Debtors' management. A trustee may better handle the Debtors' remaining estate assets. A trustee may also be in a better position to pursue potential claims for the stolen trucks.

### C. Appointment of a Chapter 11 Trustee by the U.S. Trustee

The Court inquired of the U.S. Trustee on April 2 whether, if the Court were to order the appointment of a Chapter 11 Trustee, that office would be prepared to make a recommendation or report to the Court. This question was intended to encourage the U.S. Trustee to undertake consideration of potential trustees, consult with parties in interest, undertake the necessary discussions to confirm the person selected would qualify as disinterested, and to prepare the required verified statement together with notice of the appointment and an application to approve the appointment.

This inquiry was reiterated on April 20. The reason for the inquiry was also made clear to the U.S. Trustee—to assure that if the Court were to order the appointment there would be a prompt appointment. Clearly such a prompt and timely appointment would be in the best interests of all parties in interest—creditors, the estate, and equity holders. It would also avoid any gap in supervision or control of the Debtors. The U.S. Trustee advised that it had been in consultation with the parties about possible trustees if the Court ordered an appointment.

## CONCLUSION

The Court grants the motion for the appointment of a Chapter 11 Trustee. The U.S. Trustee is hereby ordered to immediately select and appoint the Trustee and file the appropriate application together with supporting materials.

This decision constitutes findings of fact and conclusions of law under

Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: April 24, 2026

BY THE COURT:

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Hon. Catherine J. Furay
U.S. Bankruptcy Judge